No. 25-963

_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

Sean McBride, M.D., and G Shellye Horowitz,

Plaintiffs – Appellants,

v.

Kristina D. Lawson, in her official capacity as
President of the Medical Board of California,

Defendant – Appellee.

_____

On Appeal from the United States District Court
for the Eastern District of California
Honorable Kimberly J. Mueller, District Judge

_____

## APPELLANTS' OPENING BRIEF

_____

HALEY DUTCH
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (916) 503-9064
Fax: (916) 419-7747
HDutch@pacificlegal.org

CALEB R. TROTTER
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
CTrotter@pacificlegal.org

*Attorneys for Plaintiffs – Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT .................................................... 1

STATEMENT OF THE ISSUES....................................................... 1

STATEMENT OF THE CASE ........................................................... 2

    A.  Dr. McBride and Ms. Horowitz........................................... 2

    B.  California's Telehealth Licensure Rule............................ 4

    C.  The Licensure Rule Harms Patients and
          Their Physicians ....................................................................... 5

    D.  Procedural History ............................................................... 8

SUMMARY OF ARGUMENT ......................................................... 9

ARGUMENT ...................................................................................... 13

    I.   STANDARD OF REVIEW .............................................. 13

    II.  PLAINTIFFS' COMPLAINT STATES A
          FIRST AMENDMENT CLAIM....................................... 13

       A.     The Telehealth Licensure Rule Restricts Speech ................... 14

           1.   *Physician Speech Is Regulated* ....................... 14

           2.   *Patient Speech Rights Are Regulated* ........................ 22

       B.     Strict Scrutiny, Not Rational Basis Review, Applies ............. 24

    III. PLAINTIFFS ALLEGE FACTS TO STATE A COMMERCE
          CLAUSE CLAIM .............................................................. 26

       A.     The Telehealth Licensure Rule Discriminates Against
            Interstate Commerce............................................................... 27

       B.     The Licensure Rule's Interstate Burdens Far Exceed Any
            Local Benefits ....................................................................... 33

    IV. DR. MCBRIDE SUFFICIENTLY ALLEGES A PRIVILEGES
          AND IMMUNITIES CLAIM ....................................... 39

CONCLUSION ................................................................................. 44

ADDENDUM ..................................................................................... 45

CERTIFICATE OF SERVICE......................................................... 48

i

CERTIFICATE OF COMPLIANCE FOR BRIEFS ................................. 49

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................. 13, 42

*Baldwin v. Fish & Game Comm'n of Mont.*,
436 U.S. 371 (1978) ................................................................. 40

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................. 13

*Byrum v. Landreth*,
566 F.3d 442 (5th Cir. 2009) ................................................... 16

*Chalker v. Birmingham & Northwestern Ry. Co.*,
249 U.S. 522 (1919) ................................................................. 40

*Chambers v. Herrera*,
78 F.4th 1100 (9th Cir. 2023) .................................................. 13

*Chiles v. Salazar*,
116 F.4th 1178 (10th Cir. 2024),
*cert. granted*, 145 S. Ct. 1328 (2025) .................................... 21

*Conant v. Walters*,
309 F.3d 629 (9th Cir. 2002)............................... 16, 17, 19, 23

*Dean Milk Co. v. City of Madison*,
340 U.S. 349 (1951) ................................................................. 33

*Epstein v. Washington Energy Co.*,
83 F.3d 1136 (9th Cir. 1996)................................... 13, 36, 42

*Exxon Corp. v. Gov. of Maryland*,
437 U.S. 117 (1978)........................................ 27, 32, 33, 36

*Fayer v. Vaughn*,
649 F.3d 1061 (9th Cir. 2011)................................................ 13

*Granholm v. Heald*,
544 U.S. 460 (2005)................................................................. 26

*Hillside Dairy Inc. v. Lyons*,
539 U.S. 59 (2003) ................................................................... 40

*Hines v. Pardue,*
  117 F.4th 769 (5th Cir. 2024) .................................................. 18, 19, 26

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) ..................................................................... 15

*Hunt v. Wash. St. Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ........................................................ 28, 29, 30, 33

*Johnson v. Stuart,*
  702 F.2d 193 (9th Cir. 1983) ..................................................... 23

*Kassel v. Consol. Freightways Corp. of Del.,*
  450 U.S. 662 (1981) ................................................................ 32

*King v. Governor of New Jersey,*
  767 F.3d 216 (3d Cir. 2014) .................................................. 17, 21, 26

*Maine v. Taylor,*
  477 U.S. 131 (1986) ................................................................ 26

*Marilley v. Bonham,*
  844 F.3d 841 (9th Cir. 2016) .................................................. 39, 41, 42

*McBurney v. Young,*
  569 U.S. 221 (2013) ................................................................ 39

*Nat'l Ass'n for the Adv. of Multijurisdiction Prac. v. Berch,*
  773 F.3d 1037 (9th Cir. 2014) ................................................... 41

*Nat'l Inst. of Family & Life Advocates (NIFLA) v.
Becerra,* 585 U.S. 755 (2018) .................................. 11, 14, 15, 16, 22, 26

*Nat'l Pork Producers Council v. Ross,*
  598 U.S. 356 (2023) ............................................................ 26, 32

*Nat'l Pork Producers Council v. Ross,*
  6 F.4th 1021 (9th Cir. 2021) ..................................................... 36

*Or. Waste Sys., Inc. v. Dep't of Env't Quality,*
  511 U.S. 93 (1994) ................................................................. 27

*Otto v. City of Boca Raton,*
  981 F.3d 854 (11th Cir. 2020) ................................................... 21

*Pacific Coast Horseshoeing Sch., Inc. v. Kirchmeyer,*
  961 F.3d 1062 (9th Cir. 2020) ................................................... 22

iv

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014) ............................... 19, 20

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) .......................................... 11, 26, 34, 38

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ....................................................... 24

*Rocky Mountain Farmers Union v. Corey*,
    730 F.3d 1070 (9th Cir. 2013) ....................................... 27

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011) ........................................... 9, 16, 22, 24

*Sup. Ct. of New Hampshire v. Piper*,
    470 U.S. 274 (1985) ....................................................... 42

*Thomas v. Collins*, 323 U.S. 516 (1945) ................................... 16

*Thunder Studios, Inc. v. Kazal*,
    13 F.4th 736 (9th Cir. 2021) ........................................ 23

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022) ...................... 14, 20, 21, 24, 25

*Tingley v. Ferguson*,
    57 F.4th 1072 (9th Cir. 2023) ...................................... 25

*Toomer v. Witsell*,
    334 U.S. 385 (1948) ....................................................... 39

*United Bldg. Council of Camden Cnty. v. City of Camden*,
    465 U.S. 208 (1984) ....................................................... 41

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste
    Mgmt. Auth.*, 550 U.S. 330 (2007) .............................. 33

*Veterans Guardian VA Claim Consulting LLC v. Platkin*,
    133 F.4th 213 (3d Cir. 2025) ....................................... 18

*West Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994) ....................................................... 27

*Wollschlaeger v. Governor*,
    848 F.3d 1293 (11th Cir. 2017) .............................. 17, 18, 19

## Statutes

28 U.S.C. § 1291 ................................................................... 1

28 U.S.C. §§ 1331 and 1343 ................................................ 1

Ariz. Rev. Stat. § 36-3606 .................................................. 38

Cal. Bus. & Prof. Code § 2052(a) .............................. 4, 5, 35

Cal. Bus. & Prof. Code § 2052.5 .......................................... 4

Cal. Bus. & Prof. Code § 2060 ............................................. 4

Cal. Bus. & Prof. Code § 2290.5(a)(5) ................................ 4

Cal. Bus. & Prof. Code § 2290.5(a)(6) ................................ 4

Cal. Health & Safety Code § 11362.5 ................................ 16

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 3 (Dormant Commerce Clause) ............... 26, 47

U.S. Const. art. IV, § 2, cl. 1 (Privileges and Immunities
Clause) ......................................................................... 39, 47

## Rules of Court

Federal Rule of Appellate Procedure 4(a)(1)(A) ....................... 1

Federal Rule of Civil Procedure 12(b)(6) ............................ 8

## Other Authorities

DCA License Search, https://search.dca.ca.gov
(last visited June 5, 2025) ........................................ 43

Medical Interstate Telehealth Registrations,
https://dpr.delaware.gov/boards/medicalpractice/medical-
interstate-telehealth-registrations/
(last visited June 5, 2025) ........................................ 38

New York State Office of the Professions – Verification
Search, https://eservices.nysed.gov/professions/
verification-search (last visited June 5, 2025) .................... 43

Out-of-State Telehealth Provider Registration,
https://flboardofmedicine.gov/licensing/out-of-state-
telehealth-provider-registration/
(last visited June 5, 2025) ........................................ 38

Telehealth Definitions, California Department of Health
    Care Services, *available at*
    https://www.dhcs.ca.gov/provgovpart/Pages/
    telehealthdefinitions.aspx ..................................................................... 4

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343. The district court's orders and judgment granting the Defendant's Motion to Dismiss are final decisions over which this Court has appellate jurisdiction. *See* 28 U.S.C. § 1291. The district court's order granting the motion to dismiss with leave to amend the complaint was entered on November 19, 2024, ER-5, and the court's order dismissing the complaint after Plaintiffs elected not to amend was entered on January 30, 2025, ER-4. Judgment was entered on January 30, 2025. ER-3. Plaintiffs-Appellants Sean McBride, M.D., and G Shellye Horowitz filed a notice of appeal on February 12, 2025. ER-48. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(A).

## STATEMENT OF THE ISSUES

The issues on appeal are:

1. Whether Dr. McBride and Ms. Horowitz stated a First Amendment claim.

2. Whether Dr. McBride and Ms. Horowitz stated a Dormant Commerce Clause claim.

1

3.  Whether Dr. McBride stated a Privileges and Immunities Clause

claim.

## STATEMENT OF THE CASE

### A.  Dr. McBride and Ms. Horowitz

Plaintiff-Appellant Sean McBride, M.D., is a board-certified physician licensed and practicing in New York. ER-24, 26. He is a highly specialized radiation oncologist at a top specialty cancer hospital who treats genitourinary and head and neck cancers. ER-24, 26. Patients seek out Dr. McBride's unique advice from states across the country, including California. ER-24, 26. When a potential patient seeks Dr. McBride's counsel, it is typically due to the patient's local doctors lacking the necessary expertise, experience, or resources to properly diagnose and treat the patient's unique condition. ER-29. Because Dr. McBride's patients can come from anywhere, it is common to first consult with the potential patient virtually or over the phone to determine if traveling to New York for radiation treatment under his care is appropriate. ER-24–25. If a patient does receive in-person treatment from Dr. McBride in New York, Dr. McBride typically follows up with the patient virtually or over the phone. ER-24–25.

2

Plaintiff-Appellant G Shellye Horowitz suffers from Hemophilia A, which is a bleeding disorder that affects a small number of people in the United States, and even fewer women. ER-23, 31. Hemophilia A causes people to have difficulty forming blood clots, can lead to internal bleeding, and often requires infusions prior to undergoing even minor medical procedures and to prevent bleeds. ER-23. Shellye lives in a remote northern coastal California town where there are no physicians with the expertise to treat her rare condition. ER-23. In fact, the nearest hospital to Shellye with a specialized blood disorders unit with experience treating women is located a seven-hour drive away in Portland, Oregon. ER-23–24, 32. Nevertheless, because of the difficulty Shellye had in finding a doctor with experience treating women with Hemophilia A, Shellye chose to establish care with the specialists in Oregon. ER-31–32.

Since establishing care with her Oregon doctor, Shellye's life has changed for the better. Her annual bleed rate has decreased, and her quality of life has dramatically improved. ER-33. Even though her condition is currently well controlled, she requires frequent consultations—as often as once a month—with her Oregon specialist due

3

to the rarity of her condition and complicating factors that require additional monitoring to help her best manage her health. ER-33–34.

## B.    California's Telehealth Licensure Rule

Subject to few exceptions,[1] California law forbids physician-specialists like Dr. McBride from consulting with patients in California unless the physician is licensed to practice in California. *See* Cal. Bus. & Prof. Code §§ 2052(a), 2290.5(a)(6). California's strict telehealth licensure rule applies to all phone and video calls between a patient and an out-of-state physician. Cal. Bus. & Prof. Code § 2290.5(a)(5). *See also* Telehealth Definitions, California Department of Health Care Services.[2] The rule applies when the patient simply seeks to determine whether the physician can treat the patient out of state. It even applies when the physician seeks to follow up with a patient who was treated out of state.[3] Should a physician violate the rule, he or she risks prosecution for a

---

[1] Two primary exceptions include physician to physician consultations, Cal. Bus. & Prof. Code § 2060, and cases of an "immediately life-threatening disease or condition," *id*. § 2052.5.

[2] *Available at*
https://www.dhcs.ca.gov/provgovpart/Pages/telehealthdefinitions.aspx.

[3] The rule likewise applies should a patient temporarily travel to California (e.g., for work or vacation) and wish to speak with his or her physician in his or her home state. *See* ER-38.

public offense punishable by a large fine or imprisonment, in addition to professional sanctions in his or her state of licensure. *See* Cal. Bus. & Prof. Code § 2052(a). Because of the potential for criminal and professional sanctions, Shellye's physician-specialists in Oregon are increasingly unwilling to speak with her over the phone, forcing her to travel to Oregon just to have a phone or video call. *See* ER-34.

## C.     The Licensure Rule Harms Patients and Their Physicians

Telehealth provides a critical lifeline for those diagnosed with rare cancers and conditions. When a patient's local doctor lacks the expertise, experience, or resources to diagnose or treat the patient's unique condition, telehealth allows the patient to quickly seek out the necessary expertise regardless of budget or geography. *See* ER-29, 37–38. A telehealth consultation saves a patient—and often the patient's family—from having to travel to simply consult with a specialist without first determining whether the specialist can treat the patient. ER-29, 38. Without telehealth, patients and their families must travel for in-person consultations. ER-29, 37–38. The cost and time required for such travel without first knowing whether a specialist can treat a patient often prevents patients from seeking out multiple consultations and sometimes

5

prevents them from obtaining any consultation and subsequent specialty treatment. ER-29–30, 38.

For patients who manage to consult with out-of-state specialists and ultimately undergo treatment, ongoing follow-up communication is critical. ER-30. While some patients need only simple check-ups or advice, others require periodic and systematic reviews. ER-30, 38. For example, Shellye needs ongoing advice and consultation to assist her with managing her rare and uncurable bleeding disorder. ER-30, 38. Thanks to telehealth, a patient's progress and any future developments can be monitored remotely by the patient's physician without the patient needing to travel for brief check-ins. ER-30. Objective medical data (e.g., blood tests, imaging, or labs) can even be obtained locally and then reviewed and interpreted during telehealth visits by out-of-state specialists. ER-30-31, 38. Thanks to California's telehealth licensure rule, however, telehealth's lifeline is unavailable to many, including some of those who need it the most.

Because of the heavy financial and administrative burdens associated with obtaining and maintaining a medical license in multiple states, physicians are selective about which states they are licensed in.

6

ER-34–35. California does not have any licensure reciprocity agreements with other states or participate in the Interstate Medical Licensure Compact. ER-35. That means out-of-state physicians must obtain a California medical license intended for those regularly treating patients in California even if they only occasionally need to speak with California patients about treatment occurring wholly outside of California. The costs of maintaining licenses for such minimal contacts are disproportionately heavy for specialists like Dr. McBride, who may need to consult with patients from any state at any given time. ER-35.

In addition to the financial and administrative burdens created by California's telehealth licensure rule, there are also ethical and moral burdens. Many specialists believe it is their ethical duty to maintain ongoing care for their patients. ER-36. But California's telehealth licensure rule makes it illegal for Dr. McBride to satisfy that ethical duty through follow-up consultations with his California patients. ER-36. The rule also presents a moral quandary for specialists when choosing between breaking the law or turning down patients for telehealth consultations, thus leaving patients who cannot speculatively travel with

7

nowhere to turn for the necessary—and unique—medical expertise. *See* ER-36.

The telehealth licensure rule also hampers critical research by specialized experts like Dr. McBride. Many cancer patients seeking specialty care are eligible for participation in clinical trials that are open at only select hospitals. ER-37. The inability of out-of-state physicians to use telehealth to speak with California patients to determine their eligibility for such trials and to then follow up with those patients after receiving treatment through a trial decreases the chances that the trial will succeed, thus limiting patients' access to potentially life-saving treatments. ER-37.

## D.    Procedural History

The Complaint in this case was filed on May 16, 2024. ER-22. Plaintiffs challenged California's telehealth licensure rule, as applied to them, as violating the U.S. Constitution's Dormant Commerce Clause, Privileges and Immunities Clause, and the First Amendment. Defendant Kristina Lawson, in her official capacity as President of the Medical Board of California ("Medical Board"), moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs failed to state a

8

claim because the licensing requirements were a legitimate exercise of state regulatory authority and served important public health objectives. The district court granted the motion on November 19, 2024, and entered judgment in favor of the Medical Board on January 30, 2025. ER-5, 23–24. This appeal followed. ER-25.

## SUMMARY OF ARGUMENT

"[I]n the fields of medicine and public health . . . information can save lives." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011). Thanks to California's telehealth licensure rule, however, Dr. McBride is prohibited from sharing potentially lifesaving information with California patients. Likewise, the rule prevents Ms. Horowitz from receiving information from her out-of-state specialists that is needed for her rare health condition.

The COVID-19 pandemic spurred a rapid shift to telehealth, driven by urgent need. Widespread adoption forced swift technology rollout and prompted substantial legal reforms (except in California) to expand patient access. Now, only a few years later, telehealth has become an expected standard for patients and physicians, particularly for the remote specialty consultations that are at issue in this case. These

9

consults are frequently focused on newly diagnosed, life-threatening conditions.

In California, however, patients are unable to take advantage of simple technological advances that place the country's foremost medical experts only a call away. California is not home to experts in, or treatments for, every rare disease. But rather than acknowledging reality and creating a workable mechanism for needed experts to easily share their expertise with Californians, California mandates that those experts undergo its prohibitively burdensome licensing process. Even though already licensed experts like Dr. McBride do not provide any *treatment* via telehealth to California patients—such treatment is instead provided in-person where the specialist is licensed—they are required to obtain the same license as a surgeon operating in San Francisco. The requirement for a full-blown California medical license to simply advise whether specialized in-person treatment out of state is appropriate, or to check in after such treatment is provided, is not only a policy choice that endangers Californians, it is also unconstitutional.

The First Amendment to the U.S. Constitution protects the right to speak and receive information. Using telehealth to consult with a

potential patient about specialty treatment options, and to follow up with a patient after treatment is provided, is speech. California cannot "reduce a group's First Amendment rights by simply imposing a licensing requirement." *Nat'l Inst. of Family & Life Advocates (NIFLA) v. Becerra*, 585 U.S. 755, 773 (2018). Because the speech at issue in this case is not equivalent to treatment (conduct), which California has weighty interests in regulating, the full protections of the First Amendment apply.

The Dormant Commerce Clause prohibits states from discriminating against interstate commerce. Because the effects of California's telehealth licensure rule result in heavy burdens on the provision of specialty medical advice across state lines, the facially neutral rule is impermissibly discriminatory. Even under the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), the burdens that the telehealth licensure rule places on patients' lives and health, in addition to the interstate practice of medicine, easily outweigh any generic interest that California has in regulating the medical profession.

Finally, the Privileges and Immunities Clause of Article IV of the Constitution protects Dr. McBride's right to practice medicine across

11

state lines. That right is burdened by California's telehealth licensure rule. The rule discriminates against out-of-state physician-specialists, who seek only to consult and follow up with California patients, by requiring them to undergo the same licensure process as physicians providing treatment in California.

To be clear, this as-applied case is not about Dr. McBride refusing to pay fees to the Medical Board to obtain a duplicative California medical license—a license that doesn't even require him to demonstrate his unique national expertise. Nor does this case threaten California's ability to ensure those doctors who provide treatment in California are properly qualified. Rather, this case concerns the ability of patients like Ms. Horowitz to seek advice from nationally renowned medical experts located outside of California when searching for highly specialized treatment for rare cancers and diseases, and to follow up with their out-of-state specialists upon returning to California after treatment is received. To no patient's benefit, California prohibits those conversations. This Court should reverse the district court's dismissal of Dr. McBride's and Ms. Horowitz's well-pleaded Complaint and allow them to prove their claims.

# ARGUMENT

## I. STANDARD OF REVIEW

A district court's dismissal of a complaint is reviewed de novo. *Chambers v. Herrera*, 78 F.4th 1100, 1103 (9th Cir. 2023). Motions to dismiss "will only be granted if the complaint fails to allege 'enough facts to state a claim to relief that is plausible on its face.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Yet courts "must accept as true all the factual allegations contained in the complaint," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and construe those allegations "in the light most favorable to [p]laintiffs," *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

## II. PLAINTIFFS' COMPLAINT STATES A FIRST AMENDMENT CLAIM

Dr. McBride alleges that California's telehealth licensure rule restricts his ability to speak with California patients who seek his expert consultations. ER-24–25, 43–44. Ms. Horowitz alleges that the rule limits her right to consult with her out-of-state specialists concerning her rare bleeding disorder. *See*, *e.g.*, ER-44. These restrictions on the right to speak and listen are quintessential First Amendment injuries.

13

Nevertheless, the district court dismissed the claim, holding that, as a matter of law, the licensure rule only restricts conduct, or, at most it only limits a "categor[y] of speech belonging to a 'long tradition' of restriction." ER-17–19 (quoting *Tingley v. Ferguson*, 47 F.4th 1055, 1079 (9th Cir. 2022)). The decision below must be reversed.

### A.    The Telehealth Licensure Rule Restricts Speech

#### 1.    *Physician Speech Is Regulated*

Laws restricting the ability of medical professionals to communicate with patients are laws that restrict speech and are subject to First Amendment scrutiny. For example, in *NIFLA*, state-licensed pregnancy centers were required to provide patients with notice about abortion services available elsewhere. 585 U.S. at 766. The Supreme Court held that such a requirement regulated the speech of clinical workers—and not their conduct—because the notice requirement did not "facilitate informed consent to a medical procedure," nor was it "tied to a procedure at all." *Id*. at 770. Rather, the notice requirement "applie[d] to all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered, or performed." *Id*. The same is true here.

14

Dr. McBride alleges that he does not use telehealth to treat patients. ER-31. Radiation oncology cannot be performed over the telephone or through an internet video conversation. ER-26. Cancers don't respond to the spoken word. Instead, Dr. McBride uses telehealth to discuss symptoms, diagnoses, and health history with potential patients as a precursor to even determining whether he should treat them. ER-24–25, 30–31, 38. Dr. McBride's use of telehealth does not inexorably lead to treatment. ER-29–30. Dr. McBride also uses telehealth to check in with patients *after* treatment. His consultations often involve discussions about recovery and any future concerns following in-person treatment. ER-24–25, 30, 38.

Thus, as applied to Dr. McBride, the telehealth licensure rule "applies to all interactions" he has with patients and potential patients located in California "regardless of whether a medical procedure is ever sought, offered, or performed." *NIFLA*, 585 U.S. at 770. *Cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (laws that "may be described as directed at conduct" nevertheless implicate speech if "the conduct triggering coverage under the statute consists of communicating a message"). "An individual's right to speak is implicated when

15

information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated." *Sorrell*, 564 U.S. at 568 (internal quotations omitted); *see also Thomas v. Collins*, 323 U.S. 516, 536 (1945) (whether a law restricts speech or conduct depends on its practical effects).

Decisions from the courts of appeals also suggest that telehealth consultations are quintessentially speech. In *Conant v. Walters*, physicians challenged a federal policy that would cause them to lose their medical license if they gave their "recommendation or approval" for medical marijuana even if they did not prescribe it. 309 F.3d 629, 632 (9th Cir. 2002) (quoting Cal. Health & Safety Code § 11362.5); *id.* at 634 ("The fundamental disagreement between the parties concerned the extent to which the federal government could regulate doctor-patient communications without interfering with First Amendment interests."). This Court held that "[b]eing a member of a regulated profession does not, as the government suggests, result in a surrender of First Amendment rights." *Id.* at 637; *cf. NIFLA*, 585 U.S. at 773 (states cannot "reduce a group's First Amendment rights by simply imposing a licensing requirement"). *See also Byrum v. Landreth*, 566 F.3d 442, 447 (5th Cir.

16

2009) (legislature could not "license speech and reduce its constitutional protection by means of the licensing alone"). Instead, upholding "core First Amendment values," this Court found the policy unconstitutionally "punish[ed] physicians on the basis of the content of doctor-patient communications." 309 F.3d at 637. The Ninth Circuit thus recognized the distinction between prescribing marijuana (medical conduct) and simply communicating about it (pure speech).

Similarly, in *Wollschlaeger v. Governor*, a Florida law restricted physicians from, among other things, asking patients questions about their ownership of firearms unless the physician believed the question was relevant to the patient's medical care or safety. 848 F.3d 1293, 1302–03 (11th Cir. 2017) (en banc). The Eleventh Circuit noted that it was "not a hard case" to determine that the Florida law regulated physician speech instead of conduct, and endorsed the view taken by the Third Circuit that the "enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation." *Id.* at 1307–08 (quoting *King v. Governor of New Jersey*, 767 F.3d 216, 228 (3d Cir. 2014), *abrogated on other grounds by NIFLA*, 585 U.S. at 767–68). According to the court, "[s]aying that restrictions on

17

. . . speaking are merely incidental to speech is like saying that limitations on walking and running are merely incidental to ambulation." *Id.* at 1308.

More recently, the Fifth Circuit held that a Texas law requiring veterinarians to physically examine an animal before providing advice about the animal's health—via telehealth—regulated veterinarian speech. *Hines v. Pardue*, 117 F.4th 769, 772 (5th Cir. 2024). The court held that speech, not conduct, was regulated because "the act in which Dr. Hines engaged that 'triggered coverage' under the [challenged law] was the communication of a message," specifically, "email exchanges in which he communicated individualized diagnoses and treatment plans with various animal owners." *Id.* at 778. That the Texas law purported to primarily—and generally—regulate the conduct of the practice of veterinary medicine did not control the case. *Id.* at 777.

And in *Veterans Guardian VA Claim Consulting LLC v. Platkin*, the Third Circuit held that a law restricting the provision of advice to veterans in pursuing claims with the Department of Veterans Affairs likely regulated a consulting company's speech, not its conduct. 133 F.4th

18

213, 219 (3d Cir. 2025) ("Professional services delivered by speaking or writing are speech.").

As in all of the above cases, Dr. McBride seeks to speak with potential patients and advise them about whether radiation treatment would be appropriate. Thus, just as recommending or approving medical marijuana was speech in *Conant*, so are Dr. McBride's recommendations about radiation treatment. *See* 309 F.3d at 632; *see also Hines*, 117 F.4th at 778 ("communication of a message" triggered the law); *Wollschlaeger*, 848 F.3d at 1302–03, 1307–08 (physicians asking patients questions was speech).

Decisions from this Court are not to the contrary. In *Pickup v. Brown*, this Court upheld a California ban on mental health counselors providing sexual orientation change efforts therapy to minors as a regulation of conduct and not speech, because the speech (counseling) *was the treatment*. 740 F.3d 1208, 1227 (9th Cir. 2014) ("[T]he government has more leeway to regulate the conduct necessary to administering treatment itself."). But this Court also recognized the important distinction between speech as treatment and speech

19

communicating about a treatment.[4] *Id.* ("[D]octor-patient communications about medical treatment receive substantial First Amendment protection[.]").

In *Tingley*, this Court also upheld a Washington law banning sexual-orientation conversion therapy. 47 F.4th 1055. The Court emphasized that "[w]hat licensed mental health providers do during their appointments with patients for compensation under the authority of a state license *is treatment.*" *Id.* at 1082 (emphasis added). The same cannot be said for a specialized cancer doctor who simply checks in with patients as they travel or speaks to them on the phone to see if they are candidates for in-person treatment. Indeed, the *Tingley* court cited *Conant* with approval, noting that while the government could theoretically ban a course of treatment, it could not ban a doctor from communicating her opinion on that course of treatment. *Id.* at 1072 (distinguishing "prohibiting doctors from treating patients with marijuana—which the government could do—from prohibiting doctors

---

[4] In any event, because *Pickup* relied on the "professional speech" doctrine, it was abrogated by *NIFLA*.

from simply recommending marijuana").[5] As discussed above, that is this case. Dr. McBride is prohibited from treating patients in California because he does not have a California medical license, but he cannot be barred from using telehealth to simply communicate with patients about treatment, or even recommend treatment, that he may legally provide in New York.

Despite all of this binding and persuasive precedent, the district court held that the telehealth licensure rule regulates conduct and not speech as a matter of law. ER-17–19. The district court essentially redefined "treatment" as the "practice of medicine." ER-17 (quoting ER-45 to assert that "conversation[s] includ[ing] topics related to a particular patient's health care" is treatment). But such a redefinition ignores the distinctions made by this Court and others noted above establishing that treatment is conduct, whereas advice and recommendations *about*

---

[5] *Tingley* may soon no longer be good law. The Supreme Court recently granted certiorari in *Chiles v. Salazar*, 116 F.4th 1178 (10th Cir. 2024), *cert. granted*, 145 S. Ct. 1328 (2025), to resolve a circuit split on the speech versus conduct issue presented in this case. The Tenth Circuit (*Chiles*) joined the Ninth (*Tingley*) in disagreeing with the approach taken by the Third (*King*) and Eleventh (*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020)) Circuits. Regardless of the ultimate outcome in *Chiles*, the case will at least provide important guidance for this Court as to the correct disposition of the First Amendment claim.

*treatment* are speech. On the complaint as pled, the telehealth licensure rule thus "regulates [physician] speech as speech," *NIFLA*, 585 U.S. at 770, and the district court's contrary conclusion must be reversed at this stage.

### 2.   *Patient Speech Rights Are Regulated*

Although the district court dismissed the complaint in its entirety, the court did not directly address Ms. Horowitz's distinct speech claim. As alleged, Ms. Horowitz seeks to communicate with her out-of-state specialists without making the onerous trip to Oregon whenever she experiences a symptom or has a concern. ER-44. The basis for Ms. Horowitz's claim is her right to "share information with and receive information from out-of-state specialists about her ongoing care." ER-44. Because the telehealth licensure rule prevents her from sharing and receiving necessary medical information, her First Amendment rights are uniquely impeded. And because "in the fields of medicine and public health . . . information can save lives," this imposition on Ms. Horowitz's rights is dangerously severe. *See Sorrell*, 564 U.S. at 566.

Just as the right to speak is well established, so is the right to receive information. *Pacific Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,

22

961 F.3d 1062, 1069 (9th Cir. 2020) ("'restriction[s] of the right to receive information' produce 'actual injury' under the First Amendment") (quoting *Johnson v. Stuart*, 702 F.2d 193, 195 (9th Cir. 1983)); *see also Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743–44 (9th Cir. 2021). The same is true of the right to receive medical information. *See Conant*, 309 F.3d at 643 (Kozinski, J., concurring) ("[I]t is perfectly clear that the harm to patients from being denied the right to receive candid medical advice is far greater than the harm to doctors from being unable to deliver such advice.").

In dismissing the First Amendment claim after holding that Dr. McBride's speech was treatment (conduct), but without analyzing Ms. Horowitz's distinct right-to-receive claim, it is unclear whether the district court determined if Ms. Horowitz stated a First Amendment claim. If the district court dismissed Ms. Horowitz's claim as alleging a right to receive treatment (conduct), then that conclusion suffers the same flaws as the court's disposition of Dr. McBride's claim. That is, it fails to make the necessary distinctions recognized by this Court and multiple others between treatment and advice. *See, e.g., Conant*, 309 F.3d at 632. Thus, for the same reasons that the telehealth licensure rule

23

restricts Dr. McBride's speech, so does it restrict Ms. Horowitz's right to share and receive information.

## B.     Strict Scrutiny, Not Rational Basis Review, Applies

The telehealth licensure rule is a content- and speaker-based restriction on the speech of physicians and patients. It is content-based because it only applies when a physician speaks on the "particular subject matter" of healthcare. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Sorrell*, 564 U.S. at 564 (law was content-based where it "disfavor[ed] marketing, that is, speech with a particular content"); *Tingley*, 47 F.4th at 1072 (confirming that prohibiting doctors from recommending—but not prescribing marijuana—is a content- and viewpoint-based speech restriction). The licensure rule is also a speaker-based restriction because its prohibitions apply depending on whether the physician wishing to speak with California patients via telehealth possesses a California medical license. *See Sorrell*, 564 U.S. at 564; ER-45–46. As a result, strict scrutiny applies, which the Medical Board made no attempt to satisfy in its motion to dismiss. *See Reed*, 576 U.S. at 163; *Sorrell*, 564 U.S. at 564–65.

Nor did the district court hold that strict scrutiny applies. Instead, it relied on statements in *Tingley* supposing that *NIFLA* left open the possibility that "laws regulating categories of speech belonging to a 'long tradition' of restriction are subject to lesser scrutiny." ER-19–20 (quoting *Tingley*, 47 F.4th at 1079). And because "[t]here is a long . . . tradition of regulation governing the practice of those who provide health care within state borders," the district court dismissed the First Amendment claim. ER-19 (quoting *Tingley*, 47 F.4th at 1080). But the district court's conclusion overreads *Tingley* and *NIFLA*, and it is inconsistent with other medical speech cases.

In *Tingley*, this Court confirmed that prohibiting doctors from recommending marijuana is a content- and viewpoint-based speech restriction subject to heightened scrutiny. 47 F.4th at 1072. Thus, *Tingley* does not stand for the proposition that physician speech cannot receive heightened scrutiny. *Tingley v. Ferguson*, 57 F.4th 1072, 1074 (9th Cir. 2023) (O'Scannlain, J., respecting the denial of rehearing en banc) ("[R]egulation of the medical profession is not a First-Amendment-free zone."). Same with *NIFLA*. There, a state mandate that state-licensed pregnancy centers provide all patients with information about abortion

25

was subject to heightened scrutiny despite the speech occurring in a heavily regulated field. 585 U.S. at 773. And in fact, if the district court is correct, then *Conant*, *Wollschlaeger*, *King*, and *Hines*—along with many others—wrongly applied heightened scrutiny to laws restricting speech in medical and other traditionally regulated fields. Because that is not the law, this Court should reverse the dismissal of Dr. McBride's and Ms. Horowitz's First Amendment claims and allow them to proceed to discovery.

## III.   PLAINTIFFS ALLEGE FACTS TO STATE A COMMERCE CLAUSE CLAIM

The Dormant Commerce Clause, U.S. Const. art. I, § 8, cl. 3, prohibits states from "mandat[ing] differential treatment of in-state and out-of-state economic interests that benefit[] the former and burden[] the latter." *Granholm v. Heald*, 544 U.S. 460, 472 (2005). The starting point of analysis considers whether a challenged law discriminates against interstate commerce "either on its face or in practical effect." *Maine v. Taylor*, 477 U.S. 131, 138 (1986); *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 377 (2023). If so, then heightened scrutiny applies. If the law does not discriminate against interstate commerce, then the Supreme Court's balancing test set out in *Pike* applies. That test asks

26

whether "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087–88 (9th Cir. 2013). "For dormant Commerce Clause purposes, economic protectionism, or discrimination, 'simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Id.* at 1087 (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99 (1994)). Dr. McBride and Ms. Horowitz sufficiently allege that California's telehealth licensure rule both discriminates against interstate commerce in practical effect and excessively burdens interstate commerce with little corresponding benefit to Californians. *See* ER-34–41.

### A. The Telehealth Licensure Rule Discriminates Against Interstate Commerce

A facially neutral statute like California's telehealth licensure rule discriminates against interstate commerce when it "cause[s] local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 196 (1994) (quoting *Exxon Corp. v. Gov. of Maryland*, 437 U.S. 117, 126 n.16 (1978)). Such is the case here.

27

By its nature, the telehealth licensure rule—as applied to physicians like Dr. McBride and Ms. Horowitz's Oregon specialists—causes California citizens to seek less-qualified medical advice in state, when the specialized advice patients need is only available out of state.

In *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 335–36 (1977), a North Carolina statute required apples sold in the state to bear only grades adopted by the USDA. The facially evenhanded statute discriminated against interstate commerce because it resulted in: (1) an increase to the cost of doing business for Washington apple growers; (2) the erasure of competitive advantages earned by Washington growers through that state's superior state grading system; and (3) a market "leveling effect" to the benefit of North Carolina growers. *Id*. at 351–52. Likewise, here, as alleged in Dr. McBride's and Ms. Horowitz's Complaint, the licensure rule discriminates against the provision of medical advice across state lines by prohibitively raising costs for out-of-state specialists to the benefit of in-state physicians who enjoy less competition as a result. ER-35–37, 40.

**First**, out-of-state specialists like Dr. McBride face significantly higher costs when using telehealth to consult and follow up with patients

28

in California. Despite already earning board certification and paying to obtain and maintain a medical license in their home state, out-of-state doctors must bear extra expenses than doctors exclusively treating patients in California. This situation, as detailed in the Complaint, plainly protects California doctors from competition from out-of-state doctors. *See* ER-24, 34–35, 42. The increased costs "obviously . . . tend to shield [California doctors] from the competition of [out-of-state doctors] who are already at a competitive disadvantage because of their great distance from the [California] market." *Hunt*, 432 U.S. at 351.

**Second**, Dr. McBride also alleges facts showing that the licensure rule strips away his advantage to having a national practice from a single specialized location. *See Hunt*, 432 U.S. at 351; ER-30–31, 35–37, 42. As telehealth technology allows specialists with national reputations like Dr. McBride to consult and share their expertise with patients regardless of the patient's location, California's licensure rule removes that advantage by imposing burdens that make it infeasible for specialists like Dr. McBride to practice in multiple jurisdictions. *See* ER-34–36, 42.

**Third**, the licensure rule leads to a dangerous "leveling effect." In *Hunt*, the worst-case scenario for Washington apple growers being

29

unable to use their superior grading system was that apples with superior grades would be withheld from North Carolina. 432 U.S. at 352. But the Complaint here alleges facts that show much worse effects from the licensure rule. ER-24, 29, 32, 34, 36–38. For example, out-of-state specialists will stop advising California patients through telehealth, leaving those patients with the choice between seeking inferior care from local physicians without the requisite experience and expertise, traveling to the out-of-state physician to obtain advice in person, or foregoing care entirely. ER-29, 34, 37–38. This is precisely the predicament facing Ms. Horowitz. ER-32–34, 37–38. The licensure rule thus "insidiously operates to the advantage of" California physicians as patients will reserve travel only for immediately serious concerns—assuming they are able to travel at all—and will avail themselves of less-qualified local medical resources in the meantime. *See Hunt*, 432 U.S. at 351; ER-29, 34, 36–38.

The discriminatory effects of California's licensure rule do not similarly fall on physicians located in California. *See* ER-31. Dr. McBride uses telehealth only to consult with individuals seeking his specialized advice or to follow up with patients he treated in New York who have

travelled back to California. Dr. McBride treats his patients only in person at his hospital in New York where he is licensed. ER-31. California doctors, on the other hand, must be licensed in California because that is where they treat patients. The discriminatory burdens—duplicative fees, time, and ongoing compliance—do not affect California physicians who need only one license to treat California patients and to speak with California patients via telehealth technology. *See* ER-35.

Based on all of the allegations in the Complaint, as well as all necessary inferences, Dr. McBride and Ms. Horowitz have sufficiently stated a Commerce Clause claim. Their allegations, if proven, show the discriminatory effects of the telehealth licensure rule on the use of telehealth by out-of-state specialists to provide expert advice across state lines. The district court's conclusions to the contrary were premature and should be reversed.

In the district court, the Medical Board asserted that the government interest advanced by the telehealth licensure rule is protection of the public. Mot. to Dismiss at 7 (Doc. 10-1). But economic protectionism for California physicians provides the better explanation for the imposition of the licensure rule on the practice of interstate

telehealth in this narrow as-applied challenge. As discussed *infra* at 34–38, because of the disconnect between the Medical Board's justification where actual treatment of patients is not implicated by the rule as applied to Dr. McBride and Ms. Horowitz, the Supreme Court's presumption in favor of "bona fide safety regulations" does not apply. *See Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (plurality op.); *see also Nat'l Pork Producers*, 598 U.S. at 369, 379. In other words, because all actual treatment of patients occurs in a state where the specialist is licensed (e.g., New York and Oregon), the Medical Board's claimed interest simply isn't advanced in this case.

The district court held that the facially neutral telehealth licensure rule is not discriminatory. ER-10–12. In particular, the court found that the allegations that only out-of-state physicians are burdened by the licensure rule did not show that the rule was discriminatory. *See* ER-11–12. In doing so, the district court accepted the premise of the allegations that the licensure rule "gives local goods a greater share of the market at the expense of goods from outside the state," but denied that such facts give rise to claims of discrimination. ER-11–12. Yet in *Exxon Corp. v. Maryland*, the Supreme Court reiterated its previous holdings that state

laws "caus[ing] local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market," can be discriminatory. 437 U.S. at 126 n.16 (citing *Hunt*, 432 U.S. at 347, and *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951)). As discussed above, that is precisely what Dr. McBride and Ms. Horowitz allege in this case.

Where, like here, there are allegations plausibly alleging that a law is discriminatory, the law is "subject to a virtually per se rule of invalidity" and "can only be overcome by a showing that the State has no other means to advance a legitimate local purpose." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338–39 (2007). The district court's dismissal of the Commerce Clause claim must therefore be reversed so that the Medical Board is held to the required burden.

### B. The Licensure Rule's Interstate Burdens Far Exceed Any Local Benefits

Should this Court disagree that the telehealth licensure rule is discriminatory, Dr. McBride and Ms. Horowitz have still plausibly alleged a Commerce Clause claim because the licensure rule's "burdens on interstate commerce substantially outweigh the putative local

benefits." *Pike*, 397 U.S. at 142. As the Complaint alleges that the licensure rule not only burdens the use of telehealth across state lines for consultative and follow-up conversations but effectively prevents that interstate commerce, *see* ER-24, 32, 34, 37–39, the destructive burden cannot be outweighed by the Medical Board's generic interest in "safeguard[ing] the wellbeing of California patients," Mot. to Dismiss at 11 (Doc. 10-1). And because Dr. McBride and Ms. Horowitz allege the availability of less burdensome alternatives to the licensure rule, ER-42–43, the district court's dismissal of their Commerce Clause claim must be reversed. *See Pike*, 397 U.S. at 142.

The burdens of the telehealth licensure rule are severe. In fact, they are sometimes life-threatening. California patients need to consult specialists like Dr. McBride because there exists *no qualified* in-state physician. *See* ER-36–37. Similarly, Ms. Horowitz has tried for years to find in-state care for her extremely rare bleeding disorder. ER-31–32. When she finally found a specialist with sufficient expertise in treating women with her condition, the specialist was located out of state. ER-32–33. Because there was no comparable in-state alternative to her Oregon specialist, Ms. Horowitz is forced to travel out of state. ER-33.

34

As applied to Dr. McBride, the burdens of becoming licensed in California are substantial, particularly given that he is already licensed in another state. ER-34–37. If a national specialist must be licensed in California where he only occasionally will be asked to consult via telehealth, the financial and recordkeeping burdens alone would be prohibitive. ER-35. This is especially true in the context of national expert specialists who are in demand nationwide. Given those burdens— and the heavy penalties for noncompliance, Cal. Bus. & Prof. Code § 2052(a)—the availability of sought-after, expert advice from outside California to in-state patients is severely limited by the licensure rule. Therefore, the licensure rule severely harms the interstate market for medical advice and risks the life and health of the very patients it purports to help.

To the district court, however, those severe harms equated to no more than "additional compliance costs." ER-14. But as discussed, the harms alleged to patients, their out-of-state physician-specialists, and the interstate market for medical advice provided via telehealth are far greater than mere "compliance costs." The authorities cited by the district court do not support a contrary conclusion. *See* ER-14.

35

In *Nat'l Pork Producers Council v. Ross*, this Court held that "laws that increase compliance costs, *without more*, do not constitute a significant burden on interstate commerce." 6 F.4th 1021, 1032 (9th Cir. 2021) (emphasis added). But to interpret Dr. McBride's and Ms. Horowitz's Complaint as alleging no more than added compliance costs is plainly incorrect, and at a minimum fails to properly construe the allegations "in the light most favorable to [p]laintiffs." *Epstein*, 83 F.3d at 1140. Nor does *Exxon* warrant dismissal here. There, the Supreme Court held that a state law that would cause some out-of-state oil refiners to stop selling in Maryland did not overly burden interstate commerce because other out-of-state refiners would continue to supply the market. 437 U.S. at 127. Not so here, where the Complaint expressly alleges that the burdens resulting from California's telehealth licensure rule severely burden, if not entirely halt, the interstate market for medical consultations and follow-ups between California patients and out-of-state specialists. *See* ER-24, 32, 34, 37–39.

Even though the district court declined to consider whether the burdens of the telehealth licensure rule exceed any local benefits, ER-15, the Complaint plainly alleges that they do. In the lower court, the

36

Medical Board articulated the purpose of the licensure rule as "safeguard[ing] the wellbeing of California patients." Mot. to Dismiss at 11 (Doc 10-1). But as the Complaint alleges that the licensure rule—as applied in this case—actively harms patients by precluding them from receiving specialized advice, that harm easily outweighs any generic interest in public health and safety. Indeed, that Californians benefit from being precluded from using video to speak with a renowned specialist in New York about a rare cancer their California doctor is unequipped to treat is preposterous. Thus, before rejecting Dr. McBride's and Ms. Horowitz's Commerce Clause claim, the Medical Board should be held to its burden to prove its, at best, counterintuitive explanation for preventing Californians from seeking out expert advice.

In addition to the allegations of harm thoroughly discussed above, other aspects of Ms. Horowitz's experience navigating the effects of the licensure rule illustrate the excessive nature of the rule's burdens. For example, she has had severe health complications, including prolonged bleeding, while she was treated by physicians lacking expertise in treating women with hemophilia. ER-31–32. Simply allowing her to share and receive basic information via telehealth would drastically

37

improve her health and quality of life. ER-23–24, 33–34. Without that ability, the burden of traveling out of state every time she needs to speak with her specialist is untenable. ER-23–24, 34.

The availability of alternatives "with a lesser impact on interstate activities" than the licensure restriction also evidences the excessive nature of the rule's burdens. *See Pike*, 397 U.S. at 142; *see also* ER-42–43. For instance, California could ensure its interests in patient care by simply enforcing existing statutes and regulations governing standards of care on national specialty experts. And for physician-specialists using telehealth specifically, California could follow the lead of states like Arizona, Delaware, and Florida in creating a registry for out-of-state doctors engaging in telehealth.[6] Dr. McBride and Ms. Horowitz have sufficiently alleged that the burdens of the telehealth licensure rule clearly exceed any benefits. The district court's decision to the contrary must be reversed.

---

[6] Ariz. Rev. Stat. § 36-3606; Medical Interstate Telehealth Registrations, https://dpr.delaware.gov/boards/medicalpractice/medical-interstate-telehealth-registrations/ (last visited June 5, 2025); Out-of-State Telehealth Provider Registration, https://flboardofmedicine.gov/licensing/out-of-state-telehealth-provider-registration/ (last visited June 5, 2025).

## IV. DR. MCBRIDE SUFFICIENTLY ALLEGES A PRIVILEGES AND IMMUNITIES CLAIM

Under the Privileges and Immunities Clause, "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. Among the rights protected by the Clause is the right to practice an occupation—"it was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State." *Toomer v. Witsell*, 334 U.S. 385, 396 (1948); *see also McBurney v. Young*, 569 U.S. 221, 227 (2013) (Clause "protects the right of citizens to 'ply their trade, practice their occupation, or pursue a common calling.'"). A state law implicates the Privileges and Immunities Clause when it: (1) discriminates against out-of-state actors who (2) wish to exercise a fundamental right protected by the Constitution. *Marilley v. Bonham*, 844 F.3d 841, 846 (9th Cir. 2016) (en banc).

**First**, Dr. McBride plausibly alleged that the telehealth licensure rule discriminates against out-of-state physicians. As alleged in the Complaint, "[t]he telehealth licensure rule prohibits out-of-state specialists like Dr. McBride from practicing medicine across state lines."

39

ER-41. Though the rule does not facially discriminate by citizenship, its burdens fall almost entirely on out-of-state doctors. ER-34–37. Those burdens, particularly maintaining dual medical licenses, are prohibitive for specialists who only need to occasionally consult in California. ER-35, 42. And they are not faced by in-state doctors, who only need a single license to treat and speak to California patients, whereas out-of-state doctors need a license in their home state where they treat patients, as well as a second license from California just to speak with patients located in California regardless of where the patient receives treatment. Because the Privileges and Immunities Clause "has been interpreted to prevent a State from imposing unreasonable burdens on citizens of other States in their pursuit of common callings within the State," *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 383 (1978), that the telehealth licensure rule is facially neutral does not preclude a finding that the rule is discriminatory, *see Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 67 (2003) (citing *Chalker v. Birmingham & Northwestern Ry. Co.*, 249 U.S. 522 (1919)) ("[T]he absence of an express statement in the California laws and regulations identifying out-of-state citizenship as a basis for disparate treatment is not a sufficient basis for rejecting" Privileges and

40

Immunities claims.). Therefore, Dr. McBride has sufficiently alleged, and should be given an opportunity to prove, that the burdens imposed by the telehealth licensure rule are discriminatory.

**Second**, the telehealth licensure rule constrains a protected right: the right to earn a living. "[T]he pursuit of a common calling is one of the most fundamental of those privileges protected by the Clause." *United Bldg. Council of Camden Cnty. v. City of Camden*, 465 U.S. 208, 219 (1984). As a result, Dr. McBride has alleged that the telehealth licensure rule is subject to the Privileges and Immunities Clause, and the burden to show the rule withstands scrutiny under that Clause shifts to the government. *Marilley*, 844 F.3d at 846.

The district court below, however, held only that Dr. McBride's complaint does not sufficiently allege that the telehealth licensure rule is discriminatory and dismissed the Privileges and Immunities claim. ER-16 (citing *Nat'l Ass'n for the Adv. of Multijurisdiction Prac. v. Berch*, 773 F.3d 1037, 1046 (9th Cir. 2014)). For the reasons discussed here, as well as in Dr. McBride's and Ms. Horowitz's Commerce Clause argument, *supra* 27–33, the district court erred.

41

At this stage of the proceedings, the burden must be properly placed on the Medical Board to show that the licensure rule is closely related to a substantial state interest. *See Marilley*, 844 F.3d at 846. That burden cannot be met. *Iqbal*, 556 U.S. at 678; *Epstein*, 83 F.3d at 1140. In any event, the allegations in the complaint plausibly allege that the government's burden is not satisfied. *See Sup. Ct. of New Hampshire v. Piper*, 470 U.S. 274, 284 (1985) ("In deciding whether the discrimination bears a close or substantial relationship to the State's objective, the Court has considered the availability of less restrictive means.").

The interest advanced by the Medical Board is "regulating in-state medical practice." Mot. to Dismiss (Doc. 10, p. 2.) That vague interest in regulatory control is in no way put in danger by this case and is easily advanced through several less restrictive means other than the telehealth licensure rule. For example, it is uncontested that the qualifications necessary for medical licensure in California and New York are the same in all substantive aspects. ER-42. Further, it is trivially easy for state regulators, as well as members of the public, to check the

status of those licenses online.[7] Taken together, that means that California regulators can easily determine whether a physician has the necessary qualifications and is in good standing even if the physician is not licensed in California. In addition, during the COVID-19 pandemic, medical license requirements in many states were relaxed to allow interstate telehealth practice. ER-42–43. No known harms resulted. ER-42–43. And, since the pandemic, some U.S. states have established telehealth registries that allow interstate practice without the need for duplicative licensure. *See supra* n.6. Thus, California's telehealth licensure rule is *the most restrictive* way to achieve an administrative end. At this stage of the proceedings, the alternatives alleged in the complaint are more than sufficient to state a Privileges and Immunities claim. Because the district court held otherwise, this Court should reverse.

---

[7] With just the first and last name of a physician, a regulator or member of the public can find his or her license and its status in seconds. *See* New York State Office of the Professions – Verification Search, https://eservices.nysed.gov/professions/verification-search (last visited June 5, 2025); DCA License Search, https://search.dca.ca.gov (last visited June 5, 2025).

43

## CONCLUSION

Dr. McBride and Ms. Horowitz have sufficiently alleged all of their constitutional claims. The district court's order and judgment dismissing the complaint should be reversed.

DATE:  June 6, 2025.　　　Respectfully submitted,

Pacific Legal Foundation

 s/  Caleb R. Trotter
CALEB R. TROTTER
HALEY DUTCH
*Attorneys for Plaintiffs – Appellants*

# ADDENDUM

## Cal. Bus. & Prof. Code sections 2052(a) and 2290.5(a)

**2052**

(a) Notwithstanding Section 146, any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a public offense, punishable by a fine not exceeding ten thousand dollars ($10,000), by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code, by imprisonment in a county jail not exceeding one year, or by both the fine and either imprisonment.

**2290.5**

(a) For purposes of this division, the following definitions apply:

(1) "Asynchronous store and forward" means the transmission of a patient's medical information from an originating site to the health care provider at a distant site.

(2) "Distant site" means a site where a health care provider who provides health care services is located while providing these services via a telecommunications system.

(3) "Health care provider" means any of the following:

(A) A person who is licensed under this division.

(B) An associate marriage and family therapist or marriage and family therapist trainee functioning pursuant to Section 4980.43.3.

(C) A qualified autism service provider or qualified autism service professional certified by a national entity pursuant to Section 1374.73 of the Health and Safety Code and Section 10144.51 of the Insurance Code.

(D) An associate clinical social worker functioning pursuant to Section 4996.23.2.

(E) An associate professional clinical counselor or clinical counselor trainee functioning pursuant to Section 4999.46.3.

45

(4) "Originating site" means a site where a patient is located at the time health care services are provided via a telecommunications system or where the asynchronous store and forward service originates.

(5) "Synchronous interaction" means a real-time interaction between a patient and a health care provider located at a distant site.

(6) "Telehealth" means the mode of delivering health care services and public health via information and communication technologies to facilitate the diagnosis, consultation, treatment, education, care management, and self-management of a patient's health care. Telehealth facilitates patient self-management and caregiver support for patients and includes synchronous interactions and asynchronous store and forward transfers.

(b) Before the delivery of health care via telehealth, the health care provider initiating the use of telehealth shall inform the patient about the use of telehealth and obtain verbal or written consent from the patient for the use of telehealth as an acceptable mode of delivering health care services and public health. The consent shall be documented.

(c) This section does not preclude a patient from receiving in-person health care delivery services during a specified course of health care and treatment after agreeing to receive services via telehealth.

(d) The failure of a health care provider to comply with this section shall constitute unprofessional conduct. Section 2314 shall not apply to this section.

(e) This section does not alter the scope of practice of a health care provider or authorize the delivery of health care services in a setting, or in a manner, not otherwise authorized by law.

(f) All laws regarding the confidentiality of health care information and a patient's rights to the patient's medical information shall apply to telehealth interactions.

(g) All laws and regulations governing professional responsibility, unprofessional conduct, and standards of practice that apply to a health care provider under the health care provider's license shall apply to that health care provider while providing telehealth services.

(h) This section shall not apply to a patient under the jurisdiction of the Department of Corrections and Rehabilitation or any other correctional facility.

(i) (1) Notwithstanding any other law and for purposes of this section, the governing body of the hospital whose patients are receiving the

46

telehealth services may grant privileges to, and verify and approve credentials for, providers of telehealth services based on its medical staff recommendations that rely on information provided by the distant-site hospital or telehealth entity, as described in Sections 482.12, 482.22, and 485.616 of Title 42 of the Code of Federal Regulations.

(2) By enacting this subdivision, it is the intent of the Legislature to authorize a hospital to grant privileges to, and verify and approve credentials for, providers of telehealth services as described in paragraph (1).

(3) For the purposes of this subdivision, "telehealth" shall include "telemedicine" as the term is referenced in Sections 482.12, 482.22, and 485.616 of Title 42 of the Code of Federal Regulations.

## First Amendment

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

## Commerce Clause of Article I, Section 8

The Congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States;
. . .
To regulate commerce with foreign nations, and among the several states, and with the Indian tribes;

## Privileges and Immunities Clause of Article IV, Section 2, Clause 1

The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.

**CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

  s/  Caleb R. Trotter
CALEB R. TROTTER

## Certificate of Compliance for Briefs

9th Cir. Case Number: 25-963

I am the attorney or self-represented party.

**This brief contains <u>8,318</u> words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief (select only one):

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

[ ] it is a joint brief submitted by separately represented parties;

[ ] a party or parties are filing a single brief in response to multiple briefs; or

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

DATE: June 6, 2025.       <u>  s/  Caleb R. Trotter  </u>
CALEB R. TROTTER
*Attorney for Plaintiffs – Appellants*

49